Billings, A. J.
The facts of this case, and particularly the lengthy procedural history of the plaintiffs dealings with the defendant Department of Environmental Protection (“DEP”), are detailed in the Complaint and in the parties’ excellent written submissions, and will not be repeated at any great length here. In brief: the plaintiff seeks to build to build a single-family home on a 27-acre parcel fronting on the Merrimack River in Salisbury. Because his proposed drive would involve two wetlands crossings, the plaintiff was required to, and did, file a Notice of Intent with the Salisbury Conservation Commission. A copy of the NOI went to the Division of Fisheries and Wildlife Natural Heritage and Endangered Species Project (“NHESP”). On December 29, 1999 the Commission, not having heard from NHESP, issued an Order of Conditions, permitting the project.
Three days later, NHESP weighed in, expressing concern that the project would result in loss and disruption of actual habitat of the bald eagle, a species classified as “endangered” (the classification receiving maximum protection) under the Massachusetts Endangered Species Act (“MESA”) and regulations thereunder. See G.L.c. 131A and 321 C.M.R. 10.60. The DEP, on the basis of NHESP’s input, appealed the Order of Conditions and required the plaintiff to obtain a Superseding Order of Conditions from the DEP. This was issued on June 27, 2000 but the plaintiff, unhappy with one of the conditions imposed, appealed it to the DEP’s Office of Administrative Appeals.
Now, the Department advanced the view that the project’s location within actual eagle habitat meant that it needed to be reviewed under the Massachusetts Environmental Policy Act (“MEPA”). Further skirmishing before an administrative law judge resulted in a ruling that the DEP’s new position stemmed from a bona fide change in opinion as to the ability of the project to meet applicable regulatory standards, and so could be advanced. The same ALJ later found, after an evidentiary hearing, that the wetlands crossings lay within actual eagle habitat, and that MEPA review was therefore required. He stayed the DEP’s proceedings pending the conclusion of that review.
As more fully detailed below, MEPA review commences with the project proponent’s filing of an environmental notification form (“ENF”), following which the Secretary of the Executive Office of Environmental Affairs determines whether an environmental impact report (“EIR”) is required. Rather than file an ENF, however, the plaintiff commenced this action.
The plaintiffs three-count complaint seeks (a) review of the stay order under G.L.c. 30A, §14; (b) a declaratory judgment that MEPA review is not required; and (c) relief in the nature of certiorari. It prays both for preliminary injunctive relief, and for a final judgment remanding the case to the Department and ordering it to approve the project without MEPA review. The DEP has moved to dismiss the action under Rule 12(b)(6), on the ground that interlocutory review of the ALJ’s decision is unavailable, and the Complaint therefore falls to state a claim.
For the reasons that follow, the DEP’s Motion to Dismiss is ALLOWED.
DISCUSSION
A. The Regulatory and Administrative Scheme
The plaintiffs project, because of its location (riverfront, containing bordering vegetated wetlands and perhaps habitat of an endangered species), lies at the crossroads of several state environmental statutes and the regulations implementing them. The aspects of the statutory and regulatory schemes directly pertinent to the present motion are as follows.
The Wetlands Protection Act, G.L.c. 131, §40, regulates alteration of bordering vegetated wetlands and other wetland resource areas. The Act is administered by local conservation commissions, subject to review in the DEP.
As noted above, the heart of the present dispute is the DEP’s determination, with which the ALJ agreed, that the project is subject to the review process under MEPA. The SJC has summarized MEPA’s overall “legislative purpose and administrative scheme” as follows:
MEPA consists of two complementaiy provisions. General Laws c. 30, §61, establishes an official policy of environmental protection in the Commonwealth by directing that all State agencies “review, evaluate, and determine the impact on the natural environment of all works, projects or activities con *262 ducted by them and . . . use all practicable means measures to minimize damage to the environment.” Section 61 directs that an agency, before taking any action on a project, make substantive findings “describing the environmental impact, if any, of the project and [certifying] that all feasible measures have been taken to avoid or minimize said impact.” In aid of this directive, G.L.c. 30, §§62-62H establishes a process, supervised by the Secretary, thorough consideration of the potential environmental impact of certain projects through preparation of draft and final environmental impact reports (EIRs), and submission of these EIRs to interested State agencies and to the public.
MEPA review begins when the proponent of the project files an environmental notification form (ENF), to advise the Secretary of the nature of the project. G.L.c. 30, §62A. After a thirty-day review period, during which the Secretary consults with the agency and other interested parties, the Secretary issues a written certificate stating whether an environmental impact report (EIR) is required and, if so, the form, scope, content, and level of detail of the EIR. Id. The statute directs that an EIR must describe the nature and extent of the proposed project and its environmental impact; all measures being utilized to minimize environmental damage; any adverse short-term and long-term environmental consequences which cannot be avoided should the project be undertaken; and reasonable alternatives to the proposed project and their environmental consequences. G.L.c. 30, §62B. When an EIR, in draft or final form, is filed, the Secretary issues public notice of the availability of the report, which initiates a thirty-day public and agency review period. G.L.c. 30, §62C. During this time, any reviewing agency or person (or any agency with jurisdiction or with special expertise with respect to any environmental impact involved), may submit written comments to the Secretary, which then become part of the public record. Id.
Within seven days of the completion of the public comment period, the Secretary issues a final statement, indicating whether the EIR “in his judgment . .. adequately and properly complies with the provisions of sections sixty-two to sixty-two H, inclusive [the review procedures of MEPA].” Id. This certification completes the MEPA process. The record created during MEPA review (any draft and final EIRs, all public and agency comments, and the Secretary’s certification or, presumably, failure to certify) provides the information for the agency’s evaluation and subsequent §61 findings review, evaluate, and determine the impact on the natural environment of all works, projects or activities conducted by them and shall use all practicable means and measures to minimize damage to the environment.
Enos v. Secretary of Environmental Affairs, 432 Mass. 132, 136-37 (2000). Significantly for the present case, an agency’s “projects” includeand MEPA jurisdiction therefore extends tonot only the agency’s own activities, but activities by private parties which require a permit from that agency. G.L.c. 30, §62.
Regulations under MEPA provide for various “review thresholds,” which “identify categories of Projects or aspects thereof of a nature, size or location that are likely, directly or indirectly, to cause Damage to the Environment,” and whichwhen crossedtrigger MEPA review. 301 C.M.R. 11.03. One of these is:
Taking of an endangered or or species of special concern, provided that the Project site is two or more acres and includes an area mapped as a Priorify Site of Rare Species Habitats and Exemplary Natural Communities.
301 C.M.R. 11.03 (2) (b)(2).
The term “taking” is not defined in MEPA, but its verb form is defined in a third environmental statuteMESAas follows:
‘Take,” in reference to animals, to harass, harm, pursue, hunt, shoot, hound, kill, trap, capture, collect, process, disrupt the nesting, breeding, feeding or migratory activity or attempt to engage in any such conduct, or to assist such conduct, and in reference to plants, to collect, pick, kill, transplant, cut or process or attempt to engage or to assist in any such conduct.
G.L.c. 131A, §1 (emphasis supplied). There does not appear to be serious dispute that the MEPA gerund “taking” and the MESA verb “take” are to be construed consistently with one another. See Ciardi v. F. Hoffman-LaRoche, Ltd., 436 Mass. 53, 62 (2002) (“Statutes addressing the same subject matter clearly are to be construed harmoniously so as to give full effect to all of their provisions and give rise to a consistent body of law”).
B. Piecemeal Review vs. Exhaustion of Administrative Remedies
Piecemeal interlocutory review in the courts of administrative proceedings, before administrative review and remedies have been exhausted, is generally discouraged. See, e.g., McKenney v. Commission on Judicial Conduct, 380 Mass. 263, 266-67 (1980) (agency proceedings “should not be hampered by interlocutory appeals on preliminary matters, absent some extraordinary justification”); Assuncao’s Case, 372 Mass. 6, 9 (1977) (“The requirement that parties exhaust their administrative remedies before seeking review in this court is not a mere procedural device to trap the unwary litigant; rather, it is a sound principle of law and jurisprudence aimed at preserving the integrity of both the administrative and judicial processes”); Boston Edison Co. v. Brookline Realty & Inv. Corp., 10 Mass.App.Ct. 63, 66-67 (1980) (discussing reasons for *263 “the general rule that courts do not act on cases where administrative proceedings are incomplete”).
This discouragement is made express in G.L.c. 30A, §14, which permits review only of “a final decision of [an] agency in an adjudicatory proceeding.” The requirement that administrative review must ordinarily be completed before resort may be had to the courts is not, however, limited to 30A actions; it applies equally to actions seeking declaratory relief, see East Chop Tennis Club v. Massachusetts Commission Against Discrimination, 364 Mass. 444, 448-49 (Mass. 1973), and for relief in the nature of certiorari, see Boston Edison Co. v. Selectmen of Concord, 355 Mass. 79, 84, 242 N.E.2d 868 (1968).
C. The Plaintiffs Arguments for Interlocutory Judicial Review
The plaintiff offers various reasons for departing from these well-settled principles in this case. First, he argues that the decision in this case is not interlocutory at all, but final, because there will be no review of the DEP’s determination that MEPA review is required. That review willabsent judicial interventionnow go forward, and while the Secretary will determine ultimately whether an EIR will be required, he will not review the DEP’s determination that MEPA review is required.
The argument proves too much. The requirement that the plaintiff exhaust his administrative remedies is intended to avoid piecemeal judicial review; it is not dependent on the availability of piecemeal administrative review. MEPA’s evident intent is to provide a singleminded approach, supervised by the Secretary, to environmental review of projects undertaken or permitted by all state agencies. The fact that the matter will temporarily leave one agency (the DEP) for another (the Secretary) does not make the DEP’s determination a “final order.” Following MEPA review by the Secretary, the matter will return to the DEP, which will then decide, with the aid of the information developed in the MEPA review process, the ultimate issue: whether or not the environmental impacts (in particular, the impact on bald eagles) of the plaintiffs proposed project are such as to prevent the project from going forward, or whether it should be conditioned on mitigation measures. See 301 C.M.R 11.01 (4). The DEP’s determination that such review is required is a procedural stepalbeit one having potentially significant consequences for the project’s schedule and budgettoward this determination. It is not a “final order” reviewable under c. 30A, §14.
Next, the plaintiff invokes the principle that “the exhaustion of administrative remedies is not always required when an agency’s jurisdiction is challenged.” East Chop Tennis Club v. Massachusetts Comm’n Against Discrimination, 364 Mass. 444, 451 (1973), citing St Lukes Hosp. v. Labor Relations Comm’n, 320 Mass. 467, 470 (1946). He argues that in this case, the DEP lacked jurisdiction to order MEPA review, and that the Court should so determine before the administrative proceedings advance any further.
Frequently, agency jurisdiction depends on one or more factual determinations. These, because they lie within the particularized expertise of the agency, are always committed to it in the first instance. East Chop, 364 Mass, at 451-52.[1] Recognizing this, the plaintiff nonetheless asserts what he characterizes as a purely legal challenge to the DEP’s order for MEPA review: that “mere alteration of habitat is not a ‘take’ triggering MEPA’s rare species threshold.” (Complaint, 37.) Because the stay order was premised on a statutory misconstruction, the plaintiff says, there are no facts for the agency to find on which its jurisdiction might depend, and the matter is ripe for judicial review.
MESA’s definition of the word “take” is broadfar broader, for example, than in other statutes where “take” or “taking” clearly refers only to the hunting, trapping, or other harvesting of fauna or flora. See, e.g., G.L.c. 130, §§17B, 37A and 102; c. 131, §§30, 31, 50, 52A and 57. That disruption of habitat may in some cases “disrupt the nesting, breeding, feeding or migratory activity” of birds and other speciesand so fall comfortably within MESA’s definition of what it is to “take” an animalseems self-evident. Whether it will do so in a particular case is precisely the sort of factual question committed to the expertise and factfinding processes of the agencies that are subject to, and charged with enforcing, MEPA and MESA.
Even on the legal question of whether habitat alteration may ever constitute a species “taking,” moreover, due allowance is to be made for the DEP’s expertise in interpreting statutes within its purview. Retirement Board of Taunton v. Contributory Retirement Appeals Board, 56 Mass.App.Ct. 914, 915 (2002).[2] Mention might also be made of the fact that the DEP’s interpretation here appears to be consistent with its constructions in other cases. See, e.g., Douglas Environmental Assocs., Inc. v. Department of Environmental Protection, 429 Mass. 71 (1999) (determination that disturbance of salamander habitat constituted a MESA “taking”); WRT Management Corp. v. Division of Fisheries and Wildlife, 2002 WL 1293007 (Mass. Super.; Bohn, J.) (same) ; First Fed. Sav. & Loan Ass’n v. State Tax Comm’n, 372 Mass. 478, 485 (1977) (“The consistent interpretation of a statute, since its enactment, by the agency charged with the administration of the law is entitled to consideration”).
It cannot be said, as a matter of law at this stage of the proceedings, that the project involves no species taking, or that the DEP lacked jurisdiction to order the stay. In fact, MEPA regulations required the DEP, upon its factual determination that one or more MEPA thresholds had been crossed, to stay its own review process pending the Secretary’s MEPA review. 301 C.M.R. 11.12(2)(a) and (4)(a).
Finally, the plaintiff argues that the case comes within the doctrine of “present execution,” under *264 which “immediate appeal of an interlocutory order is allowed if the order will interfere with rights in a way that cannot be remedied on appeal from the final judgment.” Fabre v. Walton, 436 Mass. 517, 521 (2002) (permitting interlocutory review of SLAPP special motion to dismiss). As noted there and in Borman v. Borman, 378 Mass. 775, 780 (1978), and cases cited, the doctrine has been applied to cases in which there was an adverse ruling on a claim of immunity; an appointment or continuation of a receiver; the striking of appearances of contestants to a will; appointment of a guardian ad litem; dissolution of a partnership; or (as in Borman) disqualification of counsel.
No reported Massachusetts case has applied the present execution doctrine to administrative, as opposed to judicial, proceedings. Even assuming it could be so applied in an appropriate case, this is not such a case. For one thing, the present execution doctrine “applies only to orders on issues collateral to the controversy,” Borman, 378 Mass, at 782 n.12, which the order for MEPA review was not. Nor would interlocutory review in this case vindicate the sorts of core principles that have usually received the attention of the present execution doctrinegovemment officials’ immunity from suit; citizens’ freedom from SLAPPs; litigants’ right to counsel of their choice; and so on.
In virtually any agency or judicial proceeding, there are procedural decisions (denial of a meritorious dis-positive motion, for example) that may make the adjudicatory process longer and more expensive. The time lost and money spent cannot be recouped with a successful appeal, but the litigants must nonetheless see the process through until there is a final, appeal-able order. Here, whatever the merits of the plaintiffs factual and legal challenges to the stay order, review must await a final order in the DEP proceeding.
ORDER
For the foregoing reasons, the defendant’s motion to dismiss is ALLOWED. Judgment will enter, dismissing the Complaint.

 As the court noted in East Chop, the St Lukes Hospital case and others like it
were submitted on statements of agreed facts so that the Labor Relations Commission had no continuing fact finding role. The lack of jurisdiction of the commission appeared to be clear from the agreed facts, and was treated as a question of law which the court felt it could and should appropriately answer without requiring the plaintiffs to exhaust the available administrative remedies.
Such cases were unlike those in which agency jurisdiction “depends on facts which the Legislature has directed the commission in the first instance to find, and not the courts.” 364 Mass, at 451-52.

 Although it is the Secretary, not the DEP, that actually oversees MEPA review, the DEP is frequentlyperhaps the most frequently among all state agenciesthe determiner of whether MEPA review is required in the first place.